We'll hear argument next in No. 20-1574, Qualcomm Incorporated v. Intel Corporation, Ms. Sweezy. Thank you, Your Honor. Good morning. May it please the Court. This appeal rests on the construction of pull in Claim 31. As the Board recognized, our construction of pull is consistent with the intrinsic evidence, and yet the Board adopted a different construction, essentially construing pull as merely meaning receive. The Board gave two reasons from the intrinsic evidence for departing from our construction, and that's where I'd like to start. Do you agree that if the data is queued up in the application, that it would be sufficient for the thing to operate to say, please give me or give the queued up data? Is that sufficient? No, Your Honor. No? That would not... I know your position is that that's not within the claim language, but wouldn't that make it operable? It would not... Maybe I can answer it this way, Your Honor. That configuration and mechanism or operation would not satisfy pull as required in Claim 31 and supported by the specification. Okay, but that's not an answer to my question. My question is not whether that would come within your construction of pull, but whether as a practical matter the device would be operable if it said give, transmit the queued up data without identifying where it's stored. Thank you, Your Honor. I understand the question. In other embodiments or configurations, yes, we're not disputing that that is an inoperable way of the device being configured, and there are, in fact, other claims that would cover that sort of request and response. So you agree that would be operable? That would be operable, yes. We don't dispute that, but it would not be operable in the context of a pull limitation as Claim 31 requires. It would be outside the scope of Claim 31. And why is that? Is that because of the references in the specification? It's both because of the claim language of 31 and the references in the specification. In Claim 31, and I think there are a couple of points to emphasize here, the claim language itself, which the Board, I think, gave short shrift to, indicates and demonstrates that a pull is a function that is requiring the modem processor being in control and getting the data from the application processor. And I'd emphasize several points. First, of course, pull is used as a verb. It is an active action in Claim 31. The second point would be looking at the surrounding language of pull. So we're not just defining pull in isolation or in the abstract, but what is doing the pulling and what is being pulled. In Claim 31, there are aspects that the application processor is doing, and specifically it is configured to hold data, whereas the modem processor is configured to pull data. So that contrast reinforces that pull is something that the modem processor is controlling. To follow up on Judge Dyke's question, though, suppose that you have the modem processor demanding that all data that is currently being stored up in the application processor be shipped to the modem processor without reference to where that data may have come from. Why wouldn't that be a form of pull? Judge Bryson, I can give you a couple of responses, and one is just, again, going back to that this is an active verb that the modem processor is engaging in. Right, but the modem processor, in my example, is actively pulling the data. That is to say it is demanding that the data be sent, right? So I don't see that that gets you anywhere. Let me give you a couple of responses, one based on the claims and then a second on the specifications. So in the claims itself, there are other claims that do exactly, Judge Bryson, as you posed. For instance, asking or requesting information and then that information is sent, and it really depends on which processor is doing the transferring of the data. Again, at the high-level context, the 490 patent is talking about data transfer across an interconnectivity bus, and on the pull question, it's which processor is in control of that data transfer. Not simply asking for it and then the application processor is in control of sending it, but in the pull limitation of Claim 31, it is the modem processor that is pulling the data. Claim 10 is one example that there is a request and an invitation for the application processor to send something, and that would align with your hypothetical, Your Honor, but it would not align with the meaning of pull, the separate term used in Claim 31. We know this because the specification, every time the specification discusses pull, and it does it in detail in two particular passages of the specification, it's always using pull in the context of the modem processor knowing where to get the data from, and the Board understood this. I think this is an important point to underscore. The Board repeatedly credited our understanding of the specification passages that run from column 9 through 10 and column 15 through 16 as the modem processor knowing, based on right pointers or other indicators, where to go and get that data. It needs to know where in the buffers or with the queues or wherever the application processor might be holding the data, where the modem processor can go and get it and carry out its functionality of pulling the data across the bus back into the modem processor. At Appendix 22, at Appendix 23 to 24, at Appendix 25, and at Appendix 27, the Board is repeatedly discussing these passages at columns 9 through 10 and 15 through 16 and crediting that understanding of those disclosures as pull, needing to know the location of where the data is, based on, for instance, the disclosures of the right pointers, the buffer rings, knowing where the application processor has put its data for the modem processor to pull it in the context of Claim 31 and its pull requirement. The problem that you have, it seems to me, is that the language of the claim doesn't say that. And even if one were to agree that there are some examples in the specification where the actual storage location is known, why is it that that should suggest that that's what the overall requirement is? There's expert testimony that you don't need to know the storage location and you have yourself agreed that you don't need to know the storage location in order to pull the data. Let me give you a few responses and try to walk through the points you've raised. We do believe that the claim language itself is requiring this, both because of the word pull and in the context of it. The point you raised about the examples, of course, there is always this fine line that needs to be balanced between importing limitations from the specification and using the specification to inform the meaning of the claim. And so while certainly a patentee doesn't have to spell out everything in the claim language, that's precisely what the detailed discussions in the patent specification are. And where pull is repeatedly and consistently used in the patent specification, as the Board acknowledged, it's always in the context of knowing the location. So it doesn't necessarily have to be particularly via a right pointer. Those are different implementations, but it's always knowing where to get the data in order for the modem processor to be in control of it. So, for instance, at column 9, line 41, the patent specification specifically talks about this embodiment being where the modem processor is controlling the data, controlling the transfer of the data. There is, I think, again, and this goes back to the Board's mistake, while it credited the actual understanding of the particular discussions of pull at columns 9 through 10 and 15 through 16, it looked at two other portions of the specification to enlarge that meaning of pull. And those do not justify the Board's departure from what the specification clearly explains of pull is, what pulling is. And I think those two reasons that the Board relied on really expose the error it made. So it first relied on the most generic of statements in most patents, the concluding passage that says, as a savings matter, other embodiments are covered. That passage doesn't use pull, and this Court's case law has never allowed such a generic boilerplate passage to override the specific use of a term in the specification as the specification here does at columns 9 through 10 and 15 through 16. And certainly, that would just upend the ordinary claim construction inquiry of how the patentee chooses to disclose and describe a term that is expressly used in a claim. The second portion of the specification that the Board relied on was one other single sentence. And this is a sentence in column 16 that the Board just simply misread. It's a phrase that says there are other techniques, but of course, we have to look at what the other techniques are referencing. And they're not referencing techniques for pulling. While pull is used in that sentence, the other techniques are describing ways to indicate data is available, a precursor step to the pulling. And so other techniques follow along the string of disclosures about setting doorbells and pulling. And in column 16, I'll just finish this point if I may, Your Honor. Go ahead. Thank you. In column 16, right above that sentence that's at issue, which is at 34 to 37, above that in lines 12 through 18, and again at 18 through 30, the patent is making clear that those doorbell registers and pulling are ways to indicate data is available, specifically line 27 at column 16. It's not informing the meaning of pull unlike the other passages in the specification that are directly on point. Just a quick question. You did not move to amend claim 31 for the Board. Is that right? That's correct, Your Honor. And, of course, that's not a substitute for the ordinary and necessary claim construction inquiry, which is what the straightforward issue is in this appeal. I'll reserve the remainder of my time for rebuttal. Thank you. Okay. Mr. Saunders? Yes. Good morning. May it please the Court. I just want to start by underscoring two points that came up. The idea that our construction and the Board's construction of pull is passive receipt is a red herring. I think the Board construed it to mean receiving data in response to a request for a data. So there is an action there being done by the modem processor. And then on the question about operability, the Board credited the expert testimony from Dr. Lynn, this is pages 23 to 24 of the appendix, that there was at least one other known interconnectivity bus that doesn't require an address or location to perform a pull. And his testimony talked about the example that came up of saying to the application processor, essentially, give me everything that you have queued. And, you know, turning to the language of the claims, there's no mention in them of accessing data based on a specified location, no mention of right pointers, no context that indicates that a location is necessary. And when you put the Claim 31 in the context of the patent as a whole and the other claims, it's clear that, you know, the thrust of the patent here is about saving power by reducing the number of transitions from low power to high power. And it says the problem in the prior art is that's not being controlled. Now, our prior art shows otherwise, but what it's trying to do is group this. So the data going one way, the data going the other way is being grouped during a single active state. And so what you see in all of the embodiments and throughout the claims are a series of iterations on this same idea that are focused on the timing and the trigger for the transfer of data. So Claim 1 is a push after receipt. Claim 5 is a push after the expiration of the uplink timer. Sometimes you have a byte counter triggering. Sometimes you have a packet counter. Sometimes you have an express requirement that this be within a single wake state. And so the board's construction of pull to mean receiving data in response to a request fits very logically among all of these iterations that are focused on timing. And, you know, turning to the language and the specification at column 16 that the parties have disputed, which is the language about data can be pulled or pushed across the interconnectivity bus based on polling with an O, setting doorbell registers, or other technique. Qualcomm has tried to distinguish that language by saying this is about the initiation of the transfer as opposed to the execution of the transfer. But the fact that the specification is talking about the steps that Qualcomm describes as initiation reinforces the distinction between the push and pull, reinforces that distinction is about whether the processor is receiving data in response to a request or whether the application processor is sending it over when it wants to send it. And so you have that broadening language. And overall, the attempt that's being made here is really just a classic example to read limitations from the specification into the claim. The figure 4 embodiment that goes on columns 9 through 10 is expressly exemplary. It begins by saying on column 9, figure 4 illustrates an exemplary power saving process. And in the paragraph that is discussing the use of right pointers, although there it's right pointers to show where the data is going to go from the modem processor to the application processor, it begins by saying, for example, and it's talking about a particular standard for the interconnectivity bus, the PCIE standard that Dr. Baker, Qualcomm's expert, admitted at 2330 of the appendix is not required by the patent and that the board memorialized in the concession by Qualcomm in its opinion to that effect on page 20 through 21. And for the figure 12 embodiment, it is immediately followed by this broad or other technique language. And all of this is in a section that is dedicated to descriptions of particular embodiments that has broad language at the beginning and the end saying that the intention is not to limit these embodiments. You know, the board read this all also against the backdrop of the extrinsic evidence where its fact findings are reviewed only for substantial evidence and said, you know, we have dictionary definitions here that are all consistent with receiving information after requesting it. The board, you know, Qualcomm has pointed to some language, some examples within those definitions involving an Internet context and the board made a factual finding at page 23 of its opinion that the examples weren't limited to that context and that's not the relevant context for the patent here. The board, as I said, credited the testimony of our expert, Dr. Lin, about other known techniques that would not require address information. And then it addressed the issue Qualcomm had raised about testimony from Apple's experts in the ITC and made factual findings and said it wasn't persuaded that there was a conflict with that testimony. It put it in the context of the other proceeding. It pointed out some of the limited information ahead before it about that testimony. And if the panel has further questions on that, you know, I can address the specific statements. But, you know, all of this from start to finish is claim language that isn't restrictive, specification that is just exemplary embodiment without language indicating an intent to restrict the meaning, and all supported by factual findings on the extrinsic evidence and the dictionary definitions that back the broad understanding of the term whole in this context. I'm happy to answer any questions the panel may have. Mr. Saunders, this is Judge Bryson. I'm just curious to follow up on my question to Ms. Wiese. What significance, if any, should we give to the fact that when this issue arose as a dispute as to the breadth of Claim 31, there was no motion to amend? I think the significance is it goes hand in hand with the board's application of the BRI standard, which is part of the—and this is the case that still is governed by that standard. And part of the justification there is we do that and we'll read this and really resolve that ambiguity in favor of breadth because the patent owner has that opportunity. Now, we think that, as we argued in the alternative, even if the patent owner amended the claim here to adopt its definition of pull, it still is going to run into problems with our prior art. But the fact that there isn't that attempt to amend just reinforces the use of the BRI standard here and resolving any of this ambiguity in our favor. And that's really what the board did. Even before the board got to the extrinsic evidence, it had looked at the intrinsic evidence and said both constructions could be reasonable under this. And so under the BRI standard, that favors Intel without going to the extrinsic evidence. And then the extrinsic evidence was on top of that and was further support for our position. But there would be reasons that a patentee wouldn't want to amend, right? Because that would create potentially intervening rights. Sure. There are reasons that they would want to argue the claim construction and wouldn't want to amend. In light of that, we have never said, have we, that the failure to seek to amend is somehow an indication of weakness in the position of the patent owner because of the point that Judge Dyck has made. We frequently see the statement that in the petitioner's briefs that, well, there was no effort to amend. And I've always wondered, well, should we attach any significance to that? Or in light of the fact that the patent owner would be at least potentially confined by any amendment, does that have any weight at all? Well, I'll remember this, Convert. Yeah, go ahead. We'll remember this because in the parallel IPRs, Intel's, where it's appealing, Intel's standing is being challenged. So I would like to think that they were thinking of whether there would be further suits against Intel. But that will be a question for another day and another appeal. And we by no means are urging the panel to rely on this, the fact of the lack of amendment. As I said, I think it goes hand-in-hand with broadest reasonable interpretation. But as we argued, you know, under the fill-up standard, all the indications are pointing in our direction on these claims as not being limited. Okay. Okay. Ms. Sweezy? Thank you, Your Honor. I'm going to try to run quickly through about five points. And I think I'll just start where we ended, which is the question, as everyone agrees, is claim construction not consequences or choices to be made based on amending the claims? And it is the Phillips inquiry. So first, there was a point that pulling could be read as receiving. I would just direct the Court to other claims, such as Claims 1, 29, and 10, which are sufficient for receiving, but pull demands something more, as used in Claim 31. The second point was that there were references to other buses that may not require pull, as Claim 31 does. That is a reference to Exhibit 1021. The Board explicitly said it was not relying on that exhibit. This is at Appendix 27, to construe pull. In fact, that reference never describes a pull. It's simply a different way of operating. But the question here is not what any and all buses might do, but what a pull requires. Again, it's expressly required by the claim. Third, there was a discussion about embodiments. I'd like to emphasize, of course, there are 31 claims in this patent, and while other claims might be sufficient for focusing on timing or triggers, Claim 31 has this additional element expressly recited of the pull function. Fourth, there was a reference to Column 9 that begins one sentence by saying, For example, this court's case law is clear that when you're evaluating what might be an example, you have to look at the context. The person of ordinary skill in the art reading that passage would recognize it is an example of the particular bus mentioned there, the PCIE bus. It's not pulling in everything in that column or the patent, particularly when there is no other use of pull in the patent than one that requires a specified location, as the board recognized in crediting our reading of the patent specification. My final point is the reference to extrinsic evidence. The board itself at Appendix 22 recognized, and we agree, that the intrinsic evidence answers this. It is sufficient. The extrinsic evidence could be informative only to the extent it's relying on context similar to the 490 patent. The extrinsic evidence, to the extent it has any relevance, is looking at addresses. Of course, we always have to read it in light of the 490 patent, which is seeking a construction of pull based on one processor, grabbing data over high data transfers, over the interconnectivity bus, using ring buffers, and needing to know where to grab that data, where the location is. That is the meaning consistent with the detailed discussions of the patent specification. The board's reliance on two passages that just frankly do not address pull and cannot be used to enlarge out the meaning of pull, whether it's under Phillips or the broadest reasonable construction, is grounds for reversing the board, and at minimum remanding, but in our view, because the board does not have sufficient evidence, reversing the board's judgment. Thank you, Your Honor. Thank you, Ms. Sweezy. Thank you, Mr. Saunders. The case is submitted.